IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JOHN REY,

        Plaintiff,

v.                                                           CIV 03-183 KBM

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff John Rey worked in various positions for the City of Albuquerque for twenty-five years and retired early on December 31, 1999 at age forty-eight. Eight months later, he applied for disability benefits alleging that he became disabled on the date he retired because pain medication he was taking for arthritis and kidney stones made it unsafe for him to drive. Administrative Law Judge ("ALJ") Gary L. Vanderhoof found that Plaintiff has the residual functional capacity to perform light work and that Plaintiff therefore could return to his past relevant work either as a quality assurance specialist, construction inspector, or maintenance supervisor. Accordingly, he found Plaintiff not disabled at Step 4. After considering additional evidence, the Appeals Council declined review on December 9, 2002, thereby rendering the ALJ's decision final. *E.g., Administrative Record* ("*Record*") at 7, 20, 29-30, 67, 76-77.

This matter is before the court on Plaintiff's motion to reverse or remand, where Rey asserts that the ALJ erred in his credibility determination and his Step 4 analysis. *See Docs. 10, 11.* Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties have consented to have

me serve as the presiding judge and enter final judgment.  The record and the parties' briefs have

been read and carefully considered.  I find that the motion should be granted in part, and the

matter remanded to the Commissioner for further proceedings.

## I.  Factual Background

### A.  *Plaintiff Is Physically Active Preceding His Retirement And Works For At Least One Year While Taking Hydrocodone*

The Administration requested medical records from December 1998 forward.  It is thus

unclear precisely when Plaintiff developed problems with kidney stones and back pain, the number

of times he was treated for those conditions, the severity of the conditions, or when he initially

began taking narcotic pain medication and which physician prescribed the narcotic pain

medication.

The later medical records indicate that Rey developed kidney stone problems in 1992 and

chronic back pain in 1993.  *See Record* at 135, 153.  In 1994, he underwent a hip replacement.

*Id.* at 18, 109.  After the hip replacement, Plaintiff apparently continued to have back pain and

was treated with an epidural at least once in 1997.  *Id.* at 153.  Also in 1997, Plaintiff underwent a

parathyroidectomy[1] in an effort to treat his problems with kidney stones.  *See id.* at 138.  By at

least December 1998, Plaintiff was taking the narcotic pain reliever Hydrocodone[2] along with the

---

[1]  In 1999, Plaintiff's treating urologist noted in a letter to Plaintiff's treating physician that Plaintiff "underwent a parathyroidectomy a couple of years ago for this problem with [kidney] stones." *Record* at 138.  She later noted in another letter that Plaintiff "does have a history of hyperparathyroidism with surgery." *Id.* at 131.  In layman's terms, hyperparathyroidism is defined as "[t]oo much parathyroid hormone resulting in abnormally high levels of calcium in the blood (hypercalcemia). This can cause bone resorption and osteoporosis, calcium deposits in the kidneys, muscular weakness, nausea, vomiting, abdominal pains, and drowsiness." *www.medterms.com.*

[2]  Citing  H. Winter Griffith, M.D., *Complete Guide to Prescription & Nonprescription Drugs* 116 (2003 ed.), Plaintiff defines Hydrocodone as a "[n]arcotic pain reliever with common side effects of

non-narcotic anti-inflammatory medication Relafen.[3]  *See id.* at 127.

By the Spring 1999, Plaintiff described his condition to his treating physician Dr. Patrick Rivera as "a long history of arthritis."  *Id.* at 124.  He also told Dr. Rivera that he had been using Relafen but discontinued it because it "was not helping very much."  Instead, Rey was using Hydrocodone "on a chronic basis" while "tr[ying] to limit the amount" although there "has never been any concern about abuse of this medication."  *Id.*  Plaintiff again visited Dr. Rivera that Spring, "concerned about the long term prognosis with his arthritis and hip" and his increasing weight gain.  *Id.*  Dr. Rivera noted that Plaintiff "is trying to stay active.  Unfortunately, he has chosen some contact sports to do this [and] has tried bike riding and other activities as well."  *Id.*  Dr. Rivera

> spent about 20-30 minutes reviewing with this patient first of all

---

dizziness, drowsiness, tiredness, headache, lightheadedness, nausea or vomiting, stomach cramps, and overexcitement."  *Doc. 11* at 6, n.3.  I also note that, according to information posted by the Drug Enforcement Agency of the United States Department of Justice,

> Hydrocodone is an orally active analgesic and antitussive Schedule II narcotic that is marketed in multi-ingredient Schedule III products.  Hydrocodone has an analgesic potency similar to or greater than that of oral morphine.  Sales and production of this drug have increased significantly in recent years (a four-fold increase between 1990 and 2000), as have diversion and illicit use. Trade names include Anexsia®, Hycodan®, Hycomine®, Lorcet®, Lortab®, Tussionex®, Tylox®, Vicodin®, and Vicoprofen®. These are available as tablets, capsules, and/or syrups.  Generally this drug is abused by oral rather than intravenous administration. Currently, about 20 tons of hydrocodone products are used annually in the United States.

*http://www.usdoj.gov/dea/concern/hydrocodone.html.*

[3]  Relafen is a "nonsteroidal anti-inflammatory drug (NSAID) effective in treating fever, pain, and inflammation in the body. As a group, NSAIDs are non-narcotic relievers of mild to moderate pain of many causes, including injury, menstrual cramps, arthritis, and other musculoskeletal conditions."  *www.medterms.com.*

> medications and then diet and exercise.  I ***strongly recommended that he find a regular exercise program*** preferably something that is nonweight bearing and not contact in nature.  Recommendations such as bike riding and swimming were strongly recommended. He was given [copy illegible] We also decided to go [copy illegible].

*Id.* (emphasis added).  Based on Plaintiff's next visit to Dr. Rivera a month later, apparently the doctor placed him on the diet drug Phentermine[4] and had given him samples of the anti-inflammatory Celebrex[5] to try instead of Relafen.  Plaintiff continued to take the Hydrocodone. *See id.* at 122-23.

### B.  Acute Kidney Stone Episode Precipitates Retirement

Other than a swollen finger in August 1999, *see id.* at 120-21, Plaintiff did not have any other doctor visits before he went to the emergency room for kidney stone pain in early September 1999 where he was given a stent.  *See id.* at 193.  The kidney stone was causing increasing back pain, which did respond to "Cipro and Percocet."  *Id.* at 138.

Later that month Plaintiff underwent an extracorporeal shock wave lithotripsy or "ESWL" performed by Dr. J. Alison Hanson.  *See id.* at 136, 138-39.  ESWL is a "technique for shattering a kidney stone or gallstone with a shock wave produced outside the body."  *www.medterms.com.* Three weeks after the surgery, Dr. Hanson wrote a letter to the City of Albuquerque on Plaintiff's behalf, explaining why she believed his request for an early retirement was reasonable:

> John Rey has been under my care since September of this year for a kidney stone.  He has been seen in our clinic since October 1992 for

---

[4]  "Phentermine is in a class of drugs called anorectics which decrease appetite by possibly changing brain levels of serotonin. Phentermine is a nervous system stimulator like the amphetamines, causing stimulation, elevation of blood pressure, and faster heart rates."  *www.medterms.com.*

[5]  Like Relafen, Celebrex "is a nonsteroidal anti-inflammatory drug (NSAID) that is used to treat arthritis, pain, menstrual cramps, and colonic polyps."  *www.medterms.com.*

> stone disease.  He is currently having significant pain and needs to take medication for this which makes it unsafe for him to drive and he is concerned that he is having multiple days off due to this illness.
>
> He is currently needing to undergo another procedure for this particular stone and as this is a chronic disease, I feel that he is reasonable in requesting a recommendation to expedite his retirement due to stone disease.  Stone disease often claims many work days and in addition, it is difficult for him to work and be on pain medication.

*Id.* at 135.

The same week Dr. Hanson wrote her letter, Plaintiff visited Dr. Rivera to ask for his opinion on the subject of retirement.  *Id.* at 119.  Plaintiff recounted his history of chronic kidney stones, back and hip pain, and was at that time taking Percocet, apparently every eight hours.  *Id.* Dr. Rivera's medical record of this visit also includes the notation that Plaintiff "uses chronic narcotics which affect his ability to drive."  *Id.*  Dr. Rivera did not note or assess any depression,[6] but nonetheless did prescribe Amitryptaline, *see id.,* "an antidepressant medication. *www.medterms.com.*  Dr. Rivera also indicated that he wrote a note "recommending early retirement, *id.,* but that note does not appear in the Record.

Approximately a month after his first ESWL procedure, and a week after his visit to Dr. Rivera, Plaintiff underwent a second ESWL, again performed by Dr. Hanson.  *Id.* at 133.  X-rays taken during the second procedure "showed the stone to be apparently fragmenting well."  *Id.* at 134.  His follow-up visit "revealed no further stone fragments" and the stent was removed.  *Id.* at 132.  He was to return to see Dr. Hanson in December, *id.,* but there is no record of any such

---

[6] He assessed Plaintiff with "chronic back pain" and "nephrolitiasis."  Record at 119. Nephrolithiasis is the "process of forming a kidney stone, a stone in the kidney."  *www.medterms.com.*

visit.  *See also id.* at 78 (Plaintiff reports last visit was 11/99).  Indeed, none of Rey's subsequent

medical records show any visits to a doctor for kidney stone problems.[7]

### C.  In 2000, Plaintiff's X-Rays And Labs Are Normal
### And His Pain Is Treated With Anti-Inflammatories And Narcotics

In early 2000, Dr. Rivera prescribed Plaintiff a decongestant (Entex)[8] and allergy medicine

(Allegra),[9] along with warm packs, for ear pain.  *Id.* at  118.   Plaintiff was to call back if his

symptoms got worse, but there is no record that he did so.

Instead, a few months later Plaintiff saw Dr. Rivera complaining that his back pain had

"changed a little" and that it worried him.  *Id.* at 114.   At that point Plaintiff was "bike riding 10-

12 miles 3-4 x/week."  *Id.*   Dr. Rivera noted that Plaintiff was taking Hydrocodone twice a day

and nothing else, counseled Plaintiff on his medications, and prescribed Neurontin, *id.,* which is an

anticonvulsant but also prescribed for pain, *www.pfizer.com/download/uspi_neurontin.pdf*.   Dr.

Rivera also considered the possibility of referring Plaintiff to a chronic pain specialist, but did not

do so at that time.  *Record* at 114.

A month later, in early June 2000, Plaintiff saw Dr. Rivera again for complaints of lower

back pain radiating to his hips.  *Id.* at 112.   Plaintiff was taking Neurontin, Hydrocordone, and

---

[7]  Although Plaintiff apparently sees Dr. Hanson twice a year, *see Record* at 78, 88, Plaintiff's
attorney during the proceedings below did not submit any medical records from Dr. Hanson to the Appeals
Council.

[8]  "Entex is a medication that contains 2 different drugs, an expectorant (guaifenesin) and a
decongestant (phenylephrine). The expectorant effects of guaifenesin promote drainage of mucus from the
lungs by thinning the mucus. It also lubricates the irritated respiratory tract. Phenylephrine relieves stuffy
nose by constricting blood vessels in the nasal air passages. This reduces the flow of fluid out of the blood
vessels and into the tissues of the air passages."  *www.medterms.com.*

[9]  "Allegra . . . is an oral, 'second generation' antihistamine that is used to treat the signs
and symptoms of allergy that are due to histamine." *www.medterms.com.*

either out of or taking less Relafen.  Dr. Rivera ordered a spine and hip x-ray.  He "caution[ed] on

med use" and prescribed Vicodin and Relafen.  *Id.* at 112.  The x-rays did not show any acute

problems.[10]  Plaintiff's urologist would later note that Plaintiff "passed a stone" in June with

"some moderate back pain."  *Id.* at 131.

At his June appointment, Dr. Rivera also referred Plaintiff to a Dr. Jenick, presumably the

chronic pain specialist to which he referred at the previous visit, *id.* at 112, but the Record does

not contain any medical records from a Dr. Jenick so far as I can tell.  Plaintiff also may have seen

a Dr. Castillo at some point, but again I found no records from this doctor.  *See id.* at 111; *see*

*also id.* at 38 (Plaintiff testified at the hearing that he saw those doctors).[11]

On the other hand, Plaintiff did see Dr. Rivera, Dr. Hanson, and a Dr. Richard A Rock

---

[10]  According to the x-ray report, as for Plaintiff's lower spine:  "There are 5 lumbar-appearing vertebrae.  Pedicles appear intact.  SI joints are open.  Spina bifida occulta seen at S1.  No spondylolysis or spondylolisthesis is seen.  Lumbar vertebral body heights are maintained without evidence of acute compression fracture.  Disc space is fairly well maintained."  *Record* at 113.  The doctor's impression of the spine was " No specific finding.  Spina bifida occulta S1."  *Id.*  "S1" refers to one of the "sacral vertebrae [which] are situated in the spinal column just below the lumbar vertebrae and right above the coccyx."  *www.medterms.com.*  "Spina bifida occulta" is defined as a "bony defect in the vertebral column that causes a cleft in that column. The cleft remains covered by skin. Treatment is usually not required."  *Id.*

As for Plaintiff's hips:

> Left hip:  There is a left hip prosthesis with acetabular and femoral
> component.  No acute fraction or dislocation evident.
>
> Right hip:  Contour of the femoral head preserved.  No acute fracture or
> dislocation evident.  SI joints are open.  Perhaps early degenerative
> changes noted in the acetabulum of the right hip.

*Id.*  The doctor's impression was:  "Early degenerative change right hip [and] Left hip prosthesis.  No obvious acute finding."  *Id.*

[11]  Plaintiff's attorney during the proceedings below did not submit any such medical records to the Appeals Council for consideration.

right before and soon after he filed his application for benefits on August 12, 2000.  As of the date

he filed his application, Plaintiff indicated on his daily activities questionnaire that he walked from

¼ to ½ miles daily without any assistive devices.  He could clothe himself and write a letter but

had problems tying shoes because of difficulty bending at the waist until he took his medication.

*Id.* at 97; *see also id.* at 98 (Plaintiff was 5'10" and 220 pounds at the time).  Rey indicated that

he would fix things around the house, but it took him a long time to complete the tasks.  He

would forego taking any pain medication if he had to leave home that day so that he would not be

drowsy while driving.  *Id.* at 98.

Plaintiff saw Dr. Rock for his complaints of low back pain, and apparently did so upon a

referral by Dr. Rivera.  Plaintiff reported that he was taking Hydrocordone three times a day along

with Naprosyn, but that he did not "feel like he is getting a lot of relief with the Naprosyn."  *Id.* at

109.  Dr. Rock found Plaintiff "has no neurologic/neurovascular deficit in the [left leg] that I can

recognize.  Leg lengths are equal.  X-rays of his hip look great.  I want him to pick up the x-rays

of his back."  *Id.* at 109.  Dr. Rock recommended a "program of anti-inflammatories . . . either

Celebrex or Vioxx could be tried [and a] ***program of exercise for the low back would be helpful***

***as well.***"  *Id.* at 109 (emphasis added).  Dr. Rock would not see Plaintiff "again for a year, unless

something comes up."  *Id.* at 109.  Plaintiff did not visit Dr. Rock again.

Dr. Rivera started Plaintiff on Celebrex and noted that Plaintiff was taking Hydrocodone

three times a day, "counseled on meds," and switched Plaintiff's narcotic medication to Vicodin[12]

---

[12]  Vicodin is a combination of hydrocodone and acetaminopehn.

Hydrocodone is a narcotic pain-reliever and a cough suppressant, similar
to codeine. The precise mechanism of pain relief by hydrocodone and
other narcotics is not known. Acetaminophen is a non-narcotic analgesic

to be taken "TID" or three times a day.  *Id.* at 111; *see also id.* at 169 (duplicate).  Soon

thereafter Plaintiff indicated that the Celebrex "seem[ed] to be working fine."  *See id.* at  167-68.

Dr. Hanson's tests revealed that Plaintiff should increase his fluids, but that his parathyroid was

"normal."  *See id.* at 130-31.

### D.  In 2001, Plaintiff Treated With Antidepressant, Which He Discontinues, With Anti-Inflammatories And Narcotics For Pain, And Dr. Rivera Gives Opinion That Plaintiff Is Disabled

Plaintiff's claim for benefits was initially denied in December 2000.  Thereafter, in January

he reported to Dr. Rivera that he was unmotivated and not as physically active as before, with the

only physical activity he engaged in was walking the dog.  *Id.* at 165.  He was continuing to take

Hydrocodone.  *Id.*  Dr. Rivera "discussed issues of depression" with Plaintiff and assessed him

with "possible depression," and prescribed the antidepressant Celexa.  *Id.*  Dr. Rivera also

"***strongly rec[ommended] reg[ular] activity*** and JAT."  *Id.* at 165 (emphasis added).  Dr. Rivera

further prescribed acupuncture treatments, which Plaintiff received for the next three months but

after which the acupuncturist reported Plaintiff was "still in considerable pain . . .  unable to bend

from the waist."  *Id.* at 172; *see also id.* at 173-74, 176.  After the course of acupuncture, Plaintiff

complained of continuing back pain and knee pain to Dr. Rivera.  *See id.* at 163-64.

After changing back and forth between brands of antidepressants and narcotics, by July

2001, Plaintiff had stopped taking the antidepressants due to side effects but the combination of

---

(pain reliever) and antipyretic (fever reducer). Acetaminophen relieves
pain by elevating the pain threshold. It reduces fever through its action on
the heat regulating center of the brain. Frequently, hydrocodone and
acetaminophen are combined to achieve pain relief, as in Vicodin and
Lortab.

www.medterms.com.

Oxycontin and Celebrex was controlling his back pain and it remained controlled through a visit in September. *See id.* at 158-64. Dr. Rivera referred Plaintiff for therapy for his "possible depression." *Id.* at 158 (noting Plaintiff's wife believed her husband was depressed).

In October, Plaintiff called his health care provider asking if a Dr. Hermes was going to give him an epidural, even though he had them in the past and claimed they did not work. Dr. Hermes required a referral, and Dr. Rivera thus evaluated Plaintiff. *Id.* at 156. Plaintiff told Dr. Rivera that the psychologist to whom he had been referred recommended "stopping current [prescriptions]" and that Plaintiff was not comfortable with this approach. *Id.* at 157. Dr. Rivera therefore continued the Oxycontin prescription (later switched to Vicodin), set up a CT scan, and referred Plaintiff to Dr. Hermes for "chronic pain management." *Id.* at 157; *see also id.* at 155. Plaintiff did not see the therapist again. There is no indication in the record that he saw Dr. Hermes either.

The CT scan showed "[n]o evidence for herniated disc.," "[b]road-based disc bulge at L5-S1," "[n]o canal stenosis or neuroformania stenosis," and "[m]inimal facet joint hypertrophy is seen at L4-5 and L5-S1, likely from spondylosis." *Id.* at 151. Dr. Rivera reviewed these results with Plaintiff noting the CT scan showed "diffuse disease. ***Nothing significant.***" *Id.* at 153 (emphasis added); *see also id.* at 155. Nevertheless, Plaintiff reported that his back pain had been increasing over time and was "constantly" at a level 7 out of 10, that he is not active and the heaviest he had ever been. *Id.* at 153. Dr. Rivera's plan was for Plaintiff to see a Dr. Vermers; however, there is no medical record from any such doctor. *See id.* at 153.

Plaintiff saw Dr. Rivera in December 2001 wanting to try Oxycontin again. Dr. Rivera prescribed it, along with a gastrointenstinal drug to take before the Oxycontin. Dr. Rivera also

agreed to write a letter "indicating [Plaintiff's history of] chronic [degenerative joint disease] to

back and hip." *Id.* at 154.  The letter he wrote states:

> This is an update on Mr. Rey's condition.  He continues to suffer
> from severe incapacitating low back and hip pain secondary to a
> degenerative condition.  He has had a hip replaced.  He is still under
> my care as well as the care of orthopedists and pain management
> specialists.  I do not foresee that his condition will improve and is
> therefore considered disabled..

*Id.* at 150; *see also id.* at 19.

A week later, on December 10, 2001, Plaintiff wrote a letter to the Administration

outlining his "limitations."  *Id.* at 106-07.  He stated that he:  has to "roll out of bed;" use a chair

to shower; use elastic shoe laces "because some days I just can't bend over far enough to tie my

shoes;"  sometimes has to "get down on all fours" to pick up something he has dropped and then

cannot get back up without assistance; cannot clean toilets anymore, does not do yardwork;

cannot ride his bike, walk, or play ball; sometimes becomes forgetful; and does not socialize

because people think he is "drunk" when he is taking pain medication.  *Id.*  He did, however,

continue to forego taking pain medication – "I try to make all appt. in the morning in order to skip

medication long enough to complete any business or appt."  *Id.* at 107.

ALJ Vanderhoof also conducted the hearing on December 12, 2001.  There, among other

things, Plaintiff testified that he is in "constant pain, all the time," *id.* at 36; the pain is a "constant

seven" on a ten-step scale and is exacerbated by any activity, *id.;* he does not dwell on the pain

when he lies down, and does so four to five times a day for an hour to an hour and a half at a

time, *id.* at 36-37; currently he only walks the distance of "two football fields," *id.* at 41; he does

not ride a stationary bike at the gym because of the wait; *id.* at 46; he found that he could not

swim and sometimes cannot get to water aerobics classes because of pain, *id.;* he can vacuum, *id.* at 45; and does not take the narcotics when he drives, *see id.* at 40.

### E.  Physical Therapy Improves Pain

At their December 2001 appointment, Dr. Rivera also referred Plaintiff to Dr. Paul M. Legant for an evaluation of Plaintiff's back.  *Id.* at 154.  Plaintiff saw him thereafter on December 14, 2001.  These subsequent records were not before ALJ Vanderhoof but were submitted to, and considered by, the Appeals Council.  *See id.* at 7, 170, 191.

At the December visit, which was before ALJ Vanderhoof issued his January 24, 2002 decision, Dr. Legant found that, though stiff and sore in his lower back, Plaintiff's back and extremities were normal.[13]  Dr. Legant did not believe Plaintiff was a good candidate for surgery and instead wanted to give Plaintiff injections and start him in physical therapy to "***try to keep him limber and teach appropriate exercises,*** etc."  *Id.* at 191 (emphasis added).

By March 2002, after ALJ Vanderhoof issued his decision, Dr. Legant advised Dr. Rivera

---

[13]     PHYSICAL EXAMINATION:  Reveals a pleasant gentleman in no acute distress but certainly uncomfortable.  He is quite stiff in the low back region.  He is tender in the low back.  Otherwise the exam orthopaedically is relatively normal today with no evidence of any neurologic compromise to the upper or lower extremities and no evidence of any gross abnormalities in the upper or lower extremities including the left hip region status post previous hip replacement.

X-RAYS:  X-rays of his low back and pelvis obtained today are reviewed with him, document the previous left hip replacement.  Th right hip has some mild degenerative change but not severe in nature.  The x-rays of the low back are relatively normal per age with the exception of some mechanical arthritic changes to the L4-5, 5-1 level noted in the facet joint region.  Bone density is relatively normal.  No evidence of tumor or infection.

*Record* at 191.

that Plaintiff's lower back symptoms "are progressively getting better now with some physical therapy and some exercises, etc.," *id.* at 186; *see also id.* at 185 (Plaintiff tells physical therapist that "discomfort in his lower back is marginal at this moment"); *id.* at 184 (Plaintiff feeling sore due to initial exercise program but "did not complain about increased in the lower back region.").

## II.  Standard Of Review

If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and Plaintiff is not entitled to relief.  *E.g., Hamilton v. Sec'y of Health & Human Servs.,* 961 F.2d 1495, 1497-1500 (10th Cir. 1992).  My assessment is based on a review of the entire record, where I can neither reweigh the evidence nor substitute my judgment for that of the agency.  *E.g., Casias v. Sec'y of Health & Human Servs.,* 933 F.2d 799, 800 (10th Cir. 1991).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Castellano v. Sec'y of Health & Human Servs.,* 26 F.3d 1027, 1028 (10th Cir. 1994) (internal quotations and citations omitted).  "Evidence is insubstantial if it is overwhelmingly contradicted by other evidence."  *O'Dell v. Shalala,* 44 F.3d 855, 858 (10th Cir. 1994) (citation omitted).

When additional new medical evidence is submitted to the Appeals Council and it considers the evidence, this Court also considers the evidence in determining whether the decision is supported by substantial evidence.  I can only, however, consider medical evidence that pre-dates ALJ Vanderhoof's January 24, 2002 decision.  As such, I can consider Dr. Legant's December 2001 initial assessment of Plaintiff where he recommended physical therapy exercises, but not the subsequent reports indicating that the recommended exercise helps Plaintiff's lower back pain.  *See e.g., O'Dell v. Shalala,* 44 F.3d 855, 858-59 (10th Cir. 1994); *Tollett v. Barnhart,*

60 Fed. Appx. 263, 265 (10th Cir. 2003); *Westbrook v. Massanari,* 26 Fed.Appx. 897, 900 n.2 (10th Cir. 2002).

### III.  Analysis

ALJ Vanderhoof found that Plaintiff's problems with "multiple kidney stones, hypertension, possible depression, [or] bilateral knee pain" were not "severe" impairments at Step 2 because "these conditions have imposed not more than minimal functional restrictions on the claimant's ability to work." *Record* at 16.  He found the kidney stones not severe because "despite this disease, the claimant was able to work approximately seven years after his diagnosis," ESWL in 1999 was successful, and, aside from a stone "uneventfully" passed in June 2000 with "moderate pain," the record did not show any other kidney stone episodes.  *Id.*  The ALJ found the possible depression not severe because the initial diagnosis was equivocal, and Plaintiff discontinued seeing a therapist and his medications.  *Id.* at 16-17.  The only condition the ALJ found severe, and considered in his residual functional capacity analysis is Plaintiff's "lumbosacral degenerative joint disease."  *See id.* at 16.  Plaintiff takes no issue with the ALJ's findings that kidney stone problems and depression were eliminated from consideration of Plaintiff's residual functional capacity.

Rather, Plaintiff's claim to benefits and basis for reversal is based on the argument that (1) he is in constant back pain, which is easily aggravated and poses severely-restrictive limitations in walking, sitting, and standing, and (2) the narcotics taken to relieve the pain produce side effects which render him in a drunken-like state and preclude him from focusing or driving.  ALJ Vanderhoof recognized that Plaintiff's subjective complaints of pain and alleged consequent limitations due to back pain were at the core of the residual functional capacity analysis:

> After considering all of the evidence of record, I conclude that the
> claimant retains the residual function capacity, despite his
> impairments, to perform a range of light work . . . .  In reaching this
> conclusion, I acknowledge that the claimant has a severe
> impairment [lumbrosacral degenerative joint disease] which causes
> significant limitations on his ability to perform basic work activities.
> Indeed, the assessment of the claimant's residual functional capacity
> allows for his subjective complaints and limitations.  As discussed
> more fully below, however, to the extent that the claimant alleges
> an inability to perform any significant work activities on a sustained
> basis, his allegations and subjective complaints are found not to be
> fully credible when considered in light of the entirety of the
> evidence of record.

*Record* at 17.

ALJ Vanderhoof also identified the correct legal standards for him to apply in this regard.

That is, the ALJ "must consider all symptoms, including pain, and the extent to which these

symptoms can reasonably be accepted as consistent with the objective medical evidence and other

evidence based on the requirements of 20 CFR § 404.1529 and Social Security Ruling 96-7p."

*See id.* at 17.  Here, the parties cite Social Security Ruling 88-13.  *See Doc. 11* at 13; *see also*

*Doc. 12* at 4, 5.  However, that ruling is superceded by Ruling 96-7p, and is the one I consider

here.

As I read the decision, ALJ Vanderhoof found Plaintiff not credible for five reasons, tied

to substantial evidence that is supported by the record:

1. Plaintiff's 2000 x-rays and 2001 CT scan did not show any abnormalities and
   rather, showed only early degenerative changes and minimal arthritis;

2. Plaintiff found Celebrex to be efficacious because, in 2000, he requested a
   prescription for it after receiving samples, and physician notes in 2001
   provide that Plaintiff's back pain was controlled;

3. Plaintiff did not complain of the side effects of the narcotics to his doctors,
   and he is not dependent on them since he is able to forego taking them if he

15

is going to drive;

4. No doctor has placed any restrictions on Plaintiff, save for driving while taking narcotics; and

5. Immediately following the alleged date of onset Plaintiff was bike riding extensively, at the time of his application Plaintiff was walking daily, and at the time of the hearing Plaintiff testified that he was walking 200 yards.

*Id.* at 18.

In short, in arriving at his decision, ALJ Vanderhoof's analysis touched and relied upon the factors of objective medical evidence, medication use including efficacy and side effects, and on daily activities. Under the regulations and caselaw, each of these is among the many factors that are appropriate to consider when making a residual functional capacity determination when the issue is the extent of limitations in light of subjective allegations of disabling pain. *See e.g., Social Security Ruling 96-7p,* 1996 WL 374186 at ** 3, 5(1996); 20 C.F.R.§ 404.1529 (c), (d)(4); *see also e.g., Kepler v. Chater,* 68 F.3d 387 (10th Cir. 1995); *Luna v. Bowen,* 834 F.2d 161 (10th Cir.1987).

The majority of Plaintiff's arguments assert that ALJ Vanderhoof did not apply the correct legal standards in his credibility and residual functional capacity findings because he did not include a discussion of: Plaintiff's work history and professed willingness to work, *Doc. 11* at 9; the frequency and duration of pain despite medications, *id.* at 14; damp and windy weather as aggravating conditions, *id.;* and side effects of prescription medication, *id.* at 14-15. I disagree that these omissions constitute reversible error in this case.

As noted above, ALJ Vanderhoof was aware of the applicable standards and in fact considered and/or discussed some of the factors Plaintiff claims he did not. Moreover, when, as here, an ALJ ties his credibility analysis to substantial evidence in record and explains the reasons

for not crediting subjective complaints of pain, this Court will not disturb that finding.  The ALJ

need not engage in a point-by-point consideration of every factor identified in the regulations and

caselaw.

> [T]he ALJ did not simply recite the general factors he considered, he also
> stated what specific evidence he relied on in determining that plaintiff's
> allegations of disabling pain were not credible.  Contrary to plaintiff's view,
> our opinion in *Kepler* does not require a formalistic factor-by-factor
> recitation of the evidence.  So long as the ALJ sets forth the specific
> evidence he relies on in evaluating the claimant's credibility, the dictates of
> *Kepler* are satisfied.

*Qualls v. Apfel,* 206 F.3d 1368, 1372 (10th Cir. 2000); *see also Diaz v. Secretary of Health &*

*Human Servs.,* 898 F.2d 774, 777 (10th Cir. 1990) ("Credibility determinations are peculiarly the

province of the finder of fact, and we will not upset such determinations when supported by

substantial evidence.").

Having determined Plaintiff's allegations of limitations due to pain were exaggerated, ALJ

Vanderhoof considered two sources in determining Plaintiff's residual functional capacity – a

residual functional capacity form provided by an agency physician and Dr. Rivera's letter

providing his opinion that Plaintiff is disabled.

The ALJ gave Dr. Rivera's letter "little weight" because

> although Dr. Rivera indicates that the claimant continues to suffer from
> severe incapacitation low back and hip pain secondary to a degenerative
> condition, he does not specify particular clinical findings, symptoms, or
> functional difficulties which he is referring to in order to make such a
> finding.  Dr. Rivera has rendered an opinion which is conclusory in nature,
> which is not fully supported by the claimant's own reports and does not
> indicate specific work related functional restrictions which prevent the
> claimant from working.

*Record* at 19.  Citing *McGoffin v. Barnhart,* 288 F.3d 1248 (10th Cir. 2002), Plaintiff contends

17

that the ALJ had a duty to recontact Dr. Rivera under 20 C.F.R. § 404.1512(e)(1) to clarify the basis for Dr. Rivera's opinion or should have provided for a consultative examination. *Doc. 11* at 11-12.

I disagree that the ALJ was necessarily obliged to recontact Dr. Rivera. In *McGoffin,* the treating physician document at issue contained a specific assessment of the claimant's "work-related abilities," such as severe limitations in her ability to understand, concentrate, maintain a schedule, work without interruptions, etc. *See McGoffin,* 288 F.3d at 1251. Here, Dr. Rivera gave a bare opinion that Plaintiff is disabled, an opinion that would not have been dispositive of the issue of disability in any event. *E.g., White v. Barnhart,* 287 F.3d 903, 907 (10th Cir. 2002). ALJ Vanderhoof did not reject Dr. Rivera's opinion because the letter was "so incomplete that it could not be considered." *Id.* at 908. Rather, he rejected it as "insufficiently supported by the record as a whole." *Id.* An ALJ is not obliged to recontact a treating physician under those circumstances. *Id.*

Having rejected Dr. Rivera's opinion on the issue of what Plaintiff's limitations allow him to do, however, ALJ Vanderhoof was left with the RFC form executed by an agency physician that found Plaintiff can do light work.[14] ALJ Vanderhoof stated that his residual functional

---

[14]  Relying on *Winfrey v. Chater,* 92 F.3d 1017 (10th Cir. 1996), Plaintiff contends that the ALJ erred in relying on his own description of his past work as "light." *Doc. 11,* at 12. The

holding in *Winfrey,* however, is not designed to needlessly constrain ALJs by setting up numerous procedural hurdles that block the ultimate goal of determining disability. Rather, its concern is with the development of a record which forms the basis of a decision capable of review. . . . In *Henrie,* we found that there was no inquiry whatsoever regarding the demands of past relevant work, and that the prior occupation was never even mentioned in evidence. With a record devoid of even any mention of the demands of past relevant work, we were compelled to remand the case for the ALJ to develop that record, despite the claimant's ultimate burden of proof. . . . In the present case, the record is not devoid of

capacity finding of light work is "consistent with the opinions of the state agency medical consultants," *Record* at 18, who executed the RFC form, *id.* at 19 (citing Exhibit 5F).

A recent Tenth Circuit case compels the conclusion that where, as a here, the sole evidence of a claimant's functional abilities consists of an RFC form, the ALJ's decision cannot stand and **must** be remanded for further proceedings. I set forth the relevant portion of the decision here in detail, because the decision is not yet reported.

> The ALJ must make specific findings as to RFC, . . . and these findings must be supported by substantial evidence . . . . The ALJ must assess the "physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching)." . . . The rulings state that
>
> > [i]n assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.
>
> *Soc. Sec. R. 96-8p,* 1996 WL 374184, at *7 (emphasis added) (footnote omitted).
>
> In this case, the ALJ decided that claimant retains the RFC for the full range of light work, without pointing to any evidence to support his

---

evidence of the demands of Ms. Westbrook's past relevant work. On the contrary, it includes inquiry at the hearing as well as an earlier description of that work by Ms. Westbrook herself.

*Westbrook v. Massanari,* 26 Fed.Appx. 897, 903 (10th Cir. 2002). Plaintiff's case is likewise not devoid of evidence of the physical demands of his past work. *See Record* at 77. More importantly, there is no suggestion that Plaintiff's description of his past work is inaccurate or that it does not show that the work was considered "light."

conclusion. . . .  ***The only document that could conceivably support the conclusion is a checkmark-style RFC assessment done by an agency physician. . . .  There are two problems with this document. First, we have long held that '[s]uch [checkmark-style] evaluation forms, standing alone, unaccompanied by thorough written reports or persuasive testimony, are not substantial evidence.'  Frey v. Bowen, 816 F.2d 508, 515 (10th Cir. 1987).  This RFC assessment carries a few handwritten lines of notes from the medical evidence, a statement that the assessment is based on the medical evidence, and a conclusion that claimant is not entirely credible. . . .  Because the agency physician provided no thorough explanation, however, the RFC assessment does not constitute substantial evidence under Frey.  Second, there is no record evidence to support the conclusions on the form in any event.  Of crucial importance to this case is that no doctor has ever defined claimant's capability for walking, standing, or sitting, let alone, bending, twisting, stooping, climbing, etc.  There is a total lack of evidence about what he can do.***  Although Dr. Schoenhals and Dr. Metcalf (claimant's worker's compensation examiner) stated that claimant should be retrained for work other than his past heavy work, they did not define either the level of exertion that claimant could perform or the limitations, if any, on his movement or posture on account of his fusion or his pain. . . .  ***For these reasons, the ALJ could not make any RFC determination--there is no evidence for it.***

The agency expressly requires '[t]he adjudicator [to] ... make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC.' . . .  The ALJ must develop the record for "at least" the preceding twelve months. . . .  An ALJ is obligated to develop the record even where, as here, the claimant is represented by counsel, . . . because a disability hearing is nonadversarial. . . .  ***Finding no substantial evidence upon which to base an RFC finding, the ALJ should have recontacted claimant's physicians.  If any of claimant's doctors has more records than he provided, the ALJ has the power to subpoena them, if necessary. . . .  If additional records either do not exist or are insufficient to clarify the inconclusive evidence already in the record, then the ALJ should order a consultative examination.*** . . .

*Adkins v. Barnhart,* 2003 WL 22413920 at *4 (10th Cir. 10/23/03) (certain citations omitted)

(emphasis added).

Here, as in *Adkins,* none of Plaintiff's physicians have evaluated his physical limitations.

Indeed, they encourage him to be physically active.  As noted in the factual background section, there may be some medical records that do exist but are missing from the record.  Further, there are no explanations accompanying the check boxes on the RFC form concerning exertional and postural limitations, yet a typed comment under the symptoms section states that Plaintiff's "L hip replacement as well as early degenerative change in the R hip can be expected to result in some functional limitation."  *See Record* at 142-43, 146.  The case before me being virtually indistinguishable from the posture in *Adkins,* I find that a remand is warranted.

Wherefore,

**IT IS HEREBY ORDERED** that Plaintiff's motion is granted in part, and the matter is remanded to the Commissioner for further proceedings.  A final order will enter concurrently herewith.

UNITED STATES MAGISTRATE JUDGE
Presiding by consent.

21